Filed 8/29/22 P. v. Robinson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093999 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE015332) |
| v. | |
| TERRENCE LEE ROBINSON, | |
| Defendant and Appellant. | |

On September 24, 2020, over the course of approximately 50 minutes, defendant Terrence Lee Robinson lit fires in six Dumpsters and trash cans in midtown and downtown Sacramento. In apprehending defendant, three law enforcement officers struggled with him and ultimately subdued him using a Taser. A jury found defendant guilty of six counts of arson and one count of resisting a peace officer.

1

On appeal, defendant asserts the trial court committed prejudicial instructional errors in instructing the jury on resisting a peace officer and on arson. He also asserts he is entitled to an additional day of custody credit. While this appeal was pending, the Governor signed Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731), effective January 1, 2022, which, in addition to its own amendments to Penal Code section 1170,[1] also incorporated amendments to that section made by Assembly Bill No. 124 (2021-2022 Reg. Sess.). In supplemental briefing, defendant asserts the matter must be remanded for resentencing based on these recent legislative enactments.

We conclude that, after the jury submitted a note addressed to the resisting a peace officer count, the trial court abused its discretion in failing to instruct the jury further as set forth *post*. However, this error was harmless beyond a reasonable doubt. Furthermore, any error in the trial court's instructions on arson was harmless under any standard. We agree defendant is entitled to one additional custody credit. We further conclude the matter must be remanded for full resentencing, based not on the recent legislative enactments, but on the failure of the trial court to impose terms on several counts which constitutes an unauthorized sentence, an issue we may address even though not raised by the parties. Because we remand for full resentencing, we need not address the parties' contentions concerning Senate Bill No. 567 and Assembly Bill No. 124.

**FACTUAL AND PROCEDURAL HISTORY**

In an amended consolidated felony complaint deemed information, defendant was charged with six counts of arson (§ 451, subd. (d); counts one-six) and resisting a peace officer in the discharge or attempt to discharge his duty (§ 148, subd. (a)(1); count seven). It was further alleged defendant had sustained three prior serious felony convictions. (§§ 667, subds. (b)-(i), 1170.12.)

---

**1**      Further undesignated statutory references are to the Penal Code.

2

### *The Fires*

On September 24, 2020, an employee of a cannabis dispensary near the corner of 19th and S Streets in Sacramento, went out to lunch at approximately 3:15 p.m.[2]  As he walked south on 19th Street toward his car, he noticed smoke coming out of a Dumpster. As he continued to walk, he saw that two Dumpsters were engulfed in flames.

The dispensary had surveillance cameras on the exterior of the property.  One recording, People's exhibit 17, showed a male walking in the vicinity wearing a white T-shirt.[3]  A video recorded at approximately 3:15 p.m. from a surveillance camera at the dispensary's entrance facing the corner of 19th and S Streets, People's exhibit 18, showed the same individual walking by and pushing over the business's sandwich board signs with a cane.  The dispensary employee testified that People's exhibit 19 was an image of this individual.  He was wearing a white shirt, baggy pants, and a backpack, and he was holding a cane.  The timestamp on the image was 3:13 p.m.  Another still image, People's exhibit 13, showed the Dumpsters that had been on fire.

Alexander Nokes, an investigator for the Sacramento Fire Department, testified as an expert in fire investigation.  He investigated a fire in a Dumpster and a garbage can at 1900 S Street.  In connection with his investigation, Investigator Nokes spoke with the dispensary employee and obtained photos and videos from him.  Nokes identified the scene of the fire in a photograph he took, People's exhibit 13.  The Dumpster had been moved away from the building by firefighters.  Marks on the building wall indicated the wall had been exposed to high heat.  People's exhibit 15 showed debris on the ground from what appeared to be a melted garbage can.  According to Nokes, the garbage can

---

[2]  The relevant factual events described at trial all occurred in the City of Sacramento on September 24, 2020.

[3]  The surveillance video footage and still images described herein are part of the augmented record on appeal.  We have reviewed the exhibits discussed.

was heated sufficiently for the plastic to melt. Nokes testified it was fairly obvious the fires started inside the Dumpster and the garbage can. The fires were caused by an open flame, such as a lighter or match, applied to the contents of the Dumpster and garbage can.

At approximately 3:20 p.m., an employee of a coffee shop at 1725 R Street and a trainee were taking the garbage out. As they walked outside, they passed an African-American male walking on R Street in the direction of a light-rail station on 16th Street. He was wearing a white T-shirt and jeans, carrying a cardboard box on his shoulder. After disposing of the garbage, the coffee shop employee realized a trash can was on fire.

The coffee shop employee described what he observed in a recording from the coffee shop's surveillance video, People's exhibit 20. The employee identified himself and the trainee as they took the trash out. He also identified the male in the white T-shirt he saw traveling in the opposite direction. The individual was holding something on his left shoulder. The individual stopped at a location in the video that was largely obscured by a lighting fixture. However, a portion of the box on his shoulder could still be seen as he remained stationary in the area where, according to the employee, the trash can was located. After approximately 70 seconds, the individual walked out of the frame. When he departed, he could be seen through a gap between the light fixture and the building structure, as he moved out of the frame toward a light-rail station. According to the coffee shop employee, in the time the male stood still, he was standing in front of the garbage can with the box on his shoulder. A few seconds after he departed, smoke began coming out of the trash can. The coffee shop employee testified no one else appeared to walk or stop near the trash can until the employee himself ran to call the fire department. As he passed by the trash can, he observed smoke and flames inside.

Geoffrey Pease was also an investigator for the Sacramento Fire Department and also testified as an expert in fire investigations. According to Investigator Pease, within roughly one hour, there were fires at six locations. Pease obtained surveillance videos

4

from five of them. According to Pease, in all five videos, he observed an individual wearing clothing matching that worn by defendant at the time.

Investigator Pease inspected a Dumpster at 2531 Broadway. He obtained surveillance video from the business at that location, People's exhibit 9. The timestamp on the video was 2:40 p.m. The Dumpster did not appear in the video, but was just outside of the frame. In the video, Pease described "the individual that we identified as [defendant] walking west on Broadway." The individual walked across and out of the frame over the first 14 seconds of the recording. According to Pease, the individual was walking west toward 19th Street. He was wearing gray pants, black shoes, a white T-shirt, a black baseball cap, and a black backpack. He also appeared to be carrying a cane. According to Pease, the clothing was the same as what defendant was wearing later when Pease interviewed him. Several minutes into the video, smoke could be seen coming from the direction of the Dumpster. Pease testified that, in the recording, he did not see anyone other than defendant and one bicyclist pass by the area. Pease concluded the fire was caused by someone lighting something on fire and placing it in the Dumpster.

After speaking to the coffee shop employee about the fire at 1725 R Street, Investigator Pease went to the light-rail platform at 1715 16th Street, approximately two blocks from the coffee shop. There he observed charred material in one garbage can, and, in another, the entire contents were burned and charred. He reviewed surveillance videos from the light-rail station and saw defendant on the video wearing the same clothing. Pease saw defendant on the videos approach all three garbage cans at the light-rail station and light fires.

In People's exhibit 21, defendant could be seen approaching a trash can on the light-rail platform, placing his right hand in the trash can for between 10 and 15 seconds, pulling a piece of paper or something similar out of the trash can, placing it back in, placing his arm in the trash can, and then walking away. Based on the timestamp,

5

approximately three and a half minutes later, smoke could be seen coming out of the trash can.

People's exhibit 22 showed another angle of defendant interacting with the trash can depicted in People's exhibit 21. Later, defendant could be seen approaching a second trash can at the light-rail station. It appears that defendant pulled something out of the trash can, a flame appeared, he dropped the object back into the trash can, examined the inside of the trash can, and then left. Later in the recording, smoke could be seen coming from the trash can.[4]

Another surveillance video from the light-rail station showed a third trash can. In the video, defendant approached this trash can, reached his arm into the trash can, and then left. Shortly thereafter, smoke started coming from the trash can.

Investigator Pease concluded the fires at the light-rail station were lit intentionally.

According to Investigator Pease, in a fourth video from the light-rail station, People's exhibit 24, defendant could be seen crossing the street, traveling west on Quill Alley, and stopping at the location of another Dumpster fire. Pease described seeing smoke rising from a Dumpster in Quill Alley at the location where defendant stopped.

Investigator Pease collected additional surveillance video from a camera over a garage near the Dumpster. The video, People's exhibit 28, depicted events immediately after the footage from the light-rail station showing defendant walking west on Quill Alley. In the video, defendant approached the Dumpster in Quill Alley, reached his arm in, began to walk away, turned around, observed the Dumpster briefly, and then left. At 3:31 p.m., fire could be seen coming out of the Dumpster, less than five minutes after defendant interacted with it. During that time, Pease did not see anyone else passing by or interacting with the Dumpster. Pease concluded the fire was caused by an open flame

---

[4]     There was no charge in the information pertaining to this second trash can on the light-rail platform.

6

applied to combustible materials, and he found no sources of accidental ignition. It was Pease's opinion that defendant started the fire by holding a lighter inside the Dumpster.

Investigator Pease spoke with defendant after he was arrested. Defendant was wearing gray sweatpants, a white T-shirt, and black shoes, and he had a metal cane and a black backpack. After law enforcement arrested defendant, the fire department did not receive any more calls reporting trash or Dumpster fires in downtown or midtown Sacramento on September 24, 2020.

### *The Arrest*

Deputy Brian Gad of the Sacramento County Sheriff's Office heard a radio broadcast describing an arson suspect as a Black male wearing a black hat, white shirt, gray sweatpants, and dark shoes with a backpack and carrying a cane and a cardboard box. Gad observed someone matching that description no more than 50 yards from his location. Gad awaited backup, and, when Sacramento Police Department Sergeant Trefethen and Officer Fremgen arrived, they all approached the individual, whom Gad identified as defendant. Gad made small talk, but defendant appeared to be upset. Gad asked defendant if he was on parole or probation. Defendant cursed at Gad, said it did not matter, and began to walk away. Gad told defendant he was not free to leave and directed him to return. Gad went to grab defendant's hands. Defendant's cane fell, and, as Gad attempted to grab defendant's arm, defendant grabbed onto both of Gad's sleeves. Gad, Trefethen, and Fremgen all told defendant to stop, but defendant continued to hold onto Gad and did not loosen his grip. Gad suggested one of the other officers sweep defendant's feet out from under him. However, instead, Fremgen tased defendant's torso. Defendant tensed up, started screaming, and fell to the ground. The officers then handcuffed defendant. The prosecution played for the jury People's exhibit 5, a recording from Trefethen's body camera that depicted the officers' interaction with defendant. After defendant was apprehended, Gad looked through defendant's backpack for identification. In addition to identification, Gad found a blue Bic lighter.

7

## Verdict and Sentence

A jury found defendant guilty on all counts. In a court trial, the court found, beyond a reasonable doubt, that defendant had sustained a prior serious felony conviction. The trial court sentenced defendant to an aggregate term of five years four months consisting of the midterm of two years on count six and a consecutive term of eight months, one-third the midterm, on count four, with those sentences doubled based on defendant's prior strike conviction. The court then stated, "I'm going to run the remainder of the terms to be concurrent" under California Rules of Court, rule 4.425.

## DISCUSSION

### I

### *Instructional Error - Resisting a Peace Officer*

Defendant asserts his federal and state constitutional rights to due process and to a unanimous jury verdict were violated by the trial court's failure to properly instruct the jury on count seven charging him with resisting a peace officer.

### A. Elements, Jury Instructions, and Additional Background

"Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed," is guilty of a misdemeanor. (§ 148, subd. (a)(1).) The elements of a violation of section 148, subdivision (a)(1) are: " '(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties.' " (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329.)

The trial court instructed the jury: "The defendant is charged in Count 7 with resisting a *peace officer* in the performance or attempted performance of his duties in violation of . . . section 148[, subdivision ](a). [¶] To prove that the defendant is guilty

8

of this crime, the People must prove that: [¶] 1. Deputy Brian Gad[ ] was a *peace officer* lawfully performing or attempting to perform his duties as a *peace officer*; [¶] 2. The defendant willfully resisted Deputy Brian Gad[ ] in the performance or attempted performance of those duties; [¶] AND [¶] 3. When the defendant acted, he knew, or reasonably should have known, that Deputy Brian Gad[ ] was a *peace officer* performing or attempting to perform his duties. [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] A person who is employed as a police officer by Sacramento County Sheriff's Office is a *peace officer*." (See CALCRIM No. 2656.)

During deliberations, the jury submitted a note to the court which read: "Is it lawful for a peace officer to physically touch a suspect without verbalizing that he is under arrest or a suspect of a crime? [¶] Court reporter to read back Deputy Gad[ ]'s testimony when speaking about engaging the suspect after he starts walking away[.] [¶] What constitutes 'resisting'[?]"

In an e-mail exchange with the attorneys addressing the jury's note, defense counsel stated: "In regards to 'what constitutes resisting?' I suggest referring the jury back to the instruction. [¶] As to whether it's lawful to touch someone without announcing he/she is under arrest, I suggest telling the jury that it is up to the jury to decide if a peace officer is acting lawfully." The court sent a proposed draft response to the attorneys. Defense counsel indicated the defense was "OK with [the] Court's response." After further communications, the court stated it intended to "stick with the original response I circulated." The prosecutor agreed, and defense counsel responded, "Sounds good."

The court instructed the jury: "In Jury Question No. 1, the jury asked if it is lawful for a peace officer to physically touch a suspect without verbalizing that he is under arrest or a suspect of a crime. The court is unable to give a definitive response to

9

this question. It depends on the circumstances and the nature of the 'physical touch.' [¶] The jury also asked 'what constitutes "resisting?" ' The term resisting does not have any special definition in the law. Accordingly, as explained in Instruction 200, you are to apply that term using its ordinary, everyday meaning."

Defendant contends the trial court had a sua sponte duty to instruct the jury in the manner he asserts, including on elements of the charged offense, and claims that, to the extent his contentions are forfeited, he was deprived of the constitutionally effective assistance of counsel. The Attorney General asserts that defendant's contentions have been forfeited because defense counsel in the trial court did not object to the court's proposed response to the jury's note, and further that defendant waived the issues by affirmatively agreeing with the proposed response. (See, e.g., *People v. Harris* (2008) 43 Cal.4th 1269, 1317 [defendant waived argument that trial court committed error in its response to jury question by specifically agreeing to the court's handling of the jury's question].) Defendant relies on section 1259, which provides, in pertinent part: "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." "[T]he failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; accord, *People v. Elsey* (2000) 81 Cal.App.4th 948, 953, fn. 2.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th

10

1082, 1087, quoting *Andersen*, at p. 1249.) Therefore, we turn to the merits of defendant's contentions.[5]

## B. "Lawful Performance of His Duties" Element

As defendant asserts, " '[t]he lawfulness of the officer's conduct is an *essential element* of the offense of resisting . . . a peace officer.' " (*People v. Southard* (2021) 62 Cal.App.5th 424, 434.) "As one Court of Appeal put it in a section 148 case, '[I]f a defendant is charged with violating section 148 and the arrest is found to be unlawful, a defendant cannot be convicted of that section,' adding that an unlawful arrest includes both one made without legal grounds and one made with excessive force." (*Ibid.*, quoting *People v. White* (1980) 101 Cal.App.3d 161, 166-167.)

According to defendant, the trial court erred by failing to instruct the jury on the lawful performance element, including how the jurors were to evaluate whether the prosecution satisfied its burden of proving Deputy Gad's use of force was reasonable and/or not excessive. We first address the landscape prior to the jury's submission of its note, and then consider the effect of the note on the court's duty to instruct.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) A trial court has a sua sponte duty to instruct on defenses " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' " (*Id*. at p. 157.) Substantial evidence in this context

---

[5] Because we address the merits of defendant's contentions, we need not consider his ineffective assistance of counsel claim.

11

is "evidence sufficient for a reasonable jury to find in favor of the defendant," or, in other words, " 'evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

In his opening argument to the jury, defense counsel did not mention the resisting charge, he did not refer to the arrest, and he did not mention use of force, excessive or otherwise. Defense counsel also never mentioned the resisting charge or the use of force in his closing argument. He mentioned Deputy Gad and the arrest, but only in reference to chain of custody issues and Gad's identification of defendant. There was no suggestion defendant was relying on a defense of excessive force and that Gad was not lawfully performing his duties.

As for whether substantial evidence required the court to give the instruction relevant to a defense, Deputy Gad was the only witness to testify about the arrest. His testimony did not suggest excessive force. Defense counsel did not cross-examine Gad. Sergeant Trefethen's body camera video was played for the jury. Law enforcement did tase defendant in subduing him. This occurred after Gad approached defendant, who matched the description of a suspected felon who had started numerous fires in the area. Gad spoke with defendant for approximately 25 seconds before defendant began to walk away. Gad touched defendant and defendant grabbed onto both of Gad's uniform sleeves. The other two officers then physically engaged with defendant as well, repeatedly telling him to "stop." Defendant physically resisted all three officers for approximately 20 seconds before one of the officers tased him. Based on Gad's testimony and the body camera video, we conclude substantial evidence did not require the court to instruct the jury further on lawful performance or on excessive force before the jury submitted its questions to the court. (See generally *Breverman, supra*, 19 Cal.4th at pp. 154, 157.)

With regard to the circumstances after the submission of the jury's note, "[s]ection 1138 imposes on the trial court a mandatory 'duty to clear up any instructional confusion

12

expressed by the jury.' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016; see *People v. Giardino* (2000) 82 Cal.App.4th 454, 465 (*Giardino*) ["trial court has a duty to help the jury understand the legal principles the jury is asked to apply"].) " 'When a jury asks a question after retiring for deliberation, ". . . [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." [Citation.] But "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." ' " (*Lua,* at p. 1016.) "An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

Again, the first question in the jury's note asked: "Is it lawful for a peace officer to physically touch a suspect without verbalizing that he is under arrest or a suspect of a crime?" The jury's question raised the issue of whether Deputy Gad was lawfully performing his duties as a peace officer when he attempted to detain or arrest defendant.

"To perform their job properly and fairly, jurors must *understand* the legal principles they are charged with applying. It is the trial judge's function to facilitate such an understanding by any available means. . . . A jury's request for reinstruction or clarification should alert the trial judge that the jury has focused on what it believes are the critical issues in the case. The judge must give these inquiries serious consideration. Why has the jury focused on this issue? Does it indicate the jurors by-and-large understand the applicable law or perhaps it suggests a source of confusion? If confusion is indicated, is it simply unfamiliarity with legal terms or is it more basically a misunderstanding of an important legal concept?" (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 250.)

The jury's question focused on whether Deputy Gad was lawfully performing his duties gave rise to a duty in the trial court to provide the jury with further guidance on the issue. (§ 1138; *People v. Lua, supra*, 10 Cal.App.5th at p. 1016.) While the "trial court does not abuse its discretion when it determines the best way to aid the jury is by directing the jury to reread the applicable jury instructions that 'are themselves full and complete' " (*Lua,* at p. 1017), here, after submission of the jury's note, the original instructions were not full and complete on the matter. In the original instructions, the trial court did not read an optional bracketed portion of CALCRIM No. 2656 which provides: "[A peace officer is not lawfully performing his or her duties if he or she is (unlawfully arresting or detaining someone/ [or] using unreasonable or excessive force in his or her duties). Instruction 2670 explains (when an arrest or detention is unlawful/ [and] when force is unreasonable or excessive).]" Nor did the court read CALCRIM No. 2670 on lawful performance. The evidence demonstrated some level of force being applied to defendant during the officers' initial attempts to detain him. While it may not have been an issue defendant strategically chose to challenge, once the jurors asked a question focused on this element of the offense, the court had a duty to provide guidance on the issue, and the optional bracketed portion of CALCRIM No. 2656 and CALCRIM No. 2670 would have provided that guidance. We conclude that, after the submission of the jury note, the trial court was obligated to give the jury appropriate additional instructions, specifically the optional bracketed portion of CALCRIM No. 2656 and CALCRIM No. 2670.

To the extent this implicates the trial court's failure to instruct on an element, we generally apply the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), to determine prejudice in such instances. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324-325.) " 'In deciding whether a trial court's misinstruction on an element of an offense is prejudicial to the defendant, we ask whether it appears " ' "beyond a reasonable doubt that the error complained of did not

14

contribute to the verdict obtained." ' " ' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 350.) "Or, slightly differently . . . : 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827.) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*).)

As stated *ante*, Deputy Gad was the only witness to testify about the arrest, and his testimony did not suggest excessive force. Defense counsel chose not to cross-examine Gad. The body camera video was played for the jury and we have viewed the recording. It showed Gad approaching defendant, who matched the description of a suspected felon who had started a number of fires in the area. Gad spoke with defendant for approximately 25 seconds before defendant began to walk away. Gad touched defendant and defendant grabbed and held onto Gad's uniform sleeves. The other two officers then physically engaged with defendant, repeatedly telling him to "stop." Defendant actively, physically resisted all three officers for approximately 20 seconds before one of the officers tased him.

Moreover, the defense did not mention, let alone emphasize, the lawful performance element to the jury. In his opening statement, defense counsel did not mention the resisting charge, did not refer to the arrest, and did not mention the use of force. Defense counsel also never mentioned the resisting charge or the use of force in his closing argument.

On this record, we conclude there is not a reasonable possibility that the error in failing to instruct the jury with the optional bracketed portion of CALCRIM No. 2656 and with CALCRIM No. 2670 after the jury submitted its note contributed to the verdict on count seven. (*Reese, supra*, 2 Cal.5th at p. 671; see *Chapman, supra*, 386 U.S. at p. 24.)

## C. The Meaning of the Term "Resisting"

Defendant asserts that, in response to that portion of the jury note which asked, "[w]hat constitutes 'resisting,' " the trial court should have identified those acts alleged to constitute resistance and instructed the jurors how to analyze whether each of those acts constituted unlawful resistance. Defendant asserts the jury's question makes "evident they were confused on the actus reus." According to defendant, the issue was complicated by the fact that the prosecution failed to identify the specific act or acts that constituted resistance.

The central premise underlying defendant's contentions is that there were multiple discrete acts of alleged resistance, the prosecution was required to identify each of the discrete acts it was alleging constituted resistance, and the trial court was required to instruct the jurors "explain[ing] the relevant law, as to each listed act." For reasons we shall discuss more fully in our discussion of unanimity, *post*, we do not accept defendant's central premise. As such, we do not agree with defendant's contention that the trial court erred in failing "to identify the list of alleged acts . . . ." Nor do we find it necessary to review each of the five discrete acts defendant identifies, discussed *post*, and determine how the court should have instructed the jury on resistance relative to each act. We take the jury's question at face value. The jurors were seeking clarification of the meaning of the term "resists" in subdivision (a)(1) of section 148.

For his contention that the trial court erred in its response, directing the jury to apply the term "resisting" using its ordinary, everyday meaning, defendant relies on *Giardino, supra*, 82 Cal.App.4th 454. *Giardino* did not involve a charge of resisting a peace officer under section 148. Rather, the defendant was charged, among other things, with rape by intoxication (§ 261, subd. (a)(3)). (*Giardino*, at pp. 458-459.) The trial court instructed the jury that "one of the elements of rape by intoxication was that '[t]he alleged victim was prevented from resisting the act by an intoxicating substance . . . .' " (*Id*. at p. 464; see § 261, subd. (a)(3).) During deliberations, the jury asked the court for a

16

definition of " 'resistance.' " (*Giardino*, at p. 464.) The court instructed the jury: " '[t]his is an area in which you must use your common sense and experience to determine the everyday meaning of resistance.' " (*Ibid.*) The Court of Appeal concluded this was error. (*Id.* at pp. 465-467.) The court concluded: "The meaning of 'prevented from resisting' in this context is not clear. . . . [A]lthough the statutory language suggests that the factual issue is whether the intoxicating substance prevented the victim from physically resisting, the correct interpretation focuses on whether the victim's level of intoxication prevented him or her from exercising judgment." (*Id.* at p. 466.) Therefore, "the jury should have been instructed that its task was to determine whether, as a result of her level of intoxication, the victim lacked the legal capacity to give 'consent' as that term is defined in section 261.6." (*Ibid.*)

The complexities at issue in *Giardino* are not present here. Rather, section 148, subdivision (a)(1) contemplates the comparatively straightforward act of resisting a peace officer in the discharge or attempt to discharge any duty. Defendant has not directed us to any case involving section 148 where a jury sought clarification of the term "resists" or where it was determined to be error for the trial court to instruct the jury, with regard to that term, that "[w]ords and phrases not specifically defined in [the] instructions are to be applied using their ordinary, everyday meanings." (CALCRIM No. 200.)

Defendant has failed to demonstrate the trial court abused its discretion in its response to the jury note on the meaning of the term "resisting."

### D. Unanimity

The trial court did not instruct the jury with the bracketed portion of CALCRIM No. 2656 addressed to unanimity: "[The People allege that the defendant (resisted[,]/ [or] obstructed[,]/ [or] delayed) _____ <insert name, excluding title> by doing the following: _____ <insert description of acts when multiple acts alleged>.] You may not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of the alleged acts of (resisting[,]/ [or]

17

obstructing[,]/ [or] delaying) a (peace officer/public officer/emergency medical technician) who was lawfully performing his or her duties, and you all agree on which act (he/she) committed.]." Defendant did not request this instruction.

Defendant asserts the trial court erred in failing to give a unanimity instruction, depriving him of his right to due process and a unanimous jury verdict. Defendant asserts that the jury note demonstrated the prosecutor did not clearly communicate which acts were alleged to constitute resistance, and thus the court erred by failing to give a unanimity instruction.[6]

"Defendants in criminal cases have a constitutional right to a unanimous jury verdict. [Citation.] From this constitutional principle, courts have derived the requirement that if one criminal act is charged, but the evidence tends to show the commission of more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' " (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.) Even in the absence of a request, a unanimity instruction "must be given sua sponte where the evidence adduced at trial shows more than one act was committed which could constitute the charged offense, and the prosecutor has not relied on any single such act." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-275.)

Neither an election nor a unanimity instruction is required, however, " 'when the crime falls within the "continuous conduct" exception.' [Citation.] This exception arises in two contexts. [Citation.] First, a unanimity instruction is not required when the criminal acts are so closely connected that they form part of the same transaction, and

---

**6**    We note that, in his argument, defendant quotes language in *People v. Wallace* (2004) 123 Cal.App.4th 144, in which the court was describing its determination in a nonpublished portion of the opinion.

thus one offense. The second context occurs when the statute defines the offense to comprise a continuous course of conduct over a period of time." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1178; accord, *People v. Jennings* (2010) 50 Cal.4th 616, 679; *People v. Napoles, supra*, 104 Cal.App.4th at p. 115.) Defendant's contention that the continuous conduct exception is no longer valid is not supported by the case upon which he relies for that proposition. (See *Ramos v. Louisiana* (2020) ___ U.S. ___ [206 L.Ed.2d 583] [holding the Sixth Amendment's right to a jury trial requires a unanimous verdict in state court as well as federal court].)

Here, the evidence suggested, and the prosecutor's argument emphasized, a single act of resistance: defendant gripping Deputy Gad's sleeves after Gad touched him, physically resisting all three officers, and refusing to disengage. Moreover, even if we interpreted the evidence as tending to show the commission of more than one criminal act, the continuous conduct exception applies.

The charging document alleged defendant "did willfully and unlawfully resist, delay and obstruct [Deputy Gad], who was then and there a peace officer attempting to and discharging the duty of his/her office and employment."

In his testimony, Deputy Gad described approaching defendant with the other officers, attempting small talk, asking if defendant was on parole or probation, and, when defendant began to walk away, telling him he was not free to leave. When Gad attempted to grab defendant's hands, defendant's cane fell and, at that time, defendant grabbed both of Gad's sleeves. The three officers all struggled with defendant until Officer Fremgen tased him. Sergeant Trefethen's body camera footage is consistent with Gad's testimony. The entire recorded incident lasted less than two minutes.

The trial court instructed the jury as set forth *ante*. In his initial closing argument, with regard to the count of resisting, the prosecutor stated: "Starts with the defendant walking away. I get it. That's minimal. *And then it sort of escalated a little to the defendant grabbing the sleeves of Deputy Gad. Right? That is resisting arrest. Right?*

19

*That is resisting when Deputy Gad is trying to perform his duties as a peace officer.*"
(Italics added.) He did not discuss the resisting count in his rebuttal argument.

We disagree with defendant's characterization of the resisting count and evidence as consisting of five discrete acts. The evidence does not support this characterization of the incident as involving five distinct acts by which he allegedly violated section 148. Nor did the prosecutor's argument to the jury suggest there were such distinct acts. Clearly the prosecutor was alleging and arguing defendant's physical acts in grabbing and holding onto Gad's sleeves constituted resistance.

Defendant divides the approximately two-minute interaction into five discrete acts he maintains may have been alleged to be resisting. These five acts, as characterized by defendant, include defendant debating with Deputy Gad about walking in traffic; walking away before Gad told defendant he was being detained; grabbing Gad's sleeves; failing to provide his name to officers after he was taken to the ground and handcuffed; and thereafter swearing at Gad.

In any event, we further conclude that, even if the evidence and argument supported the premise that the prosecution was focused on several acts of resistance, these acts constituted a continuous course of conduct by which defendant obstructed and delayed Deputy Gad. The jury's note did nothing to change this. The trial court did not abuse its discretion in failing to give a unanimity instruction as to this count.

### E. Cumulative Error

As we have found two of defendant's contentions to be without merit and the third to be harmless beyond a reasonable doubt, we necessarily reject his contention that the asserted errors were cumulatively prejudicial, depriving him of a fair trial. (*People v. Bennett* (2009) 45 Cal.4th 577, 618 ["With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error; thus there is no cumulative error."].)

20

## II

### *Instructional Error - Arson*

#### A. Arson, Additional Background, and the Trial Court's Instructions

"A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property." (§ 451.)

At the jury instruction conference, the prosecutor requested language from the bench notes for CALCRIM No. 1515, the instruction for arson, summarizing an issue in a case note for *In re L.T.* (2002) 103 Cal.App.4th 262, 264. That language would state: "burning trash that does not belong to the defendant is arson. There is no requirement for arson that the property belong to anyone." (Judicial Council of Cal., Crim. Jury Instns. (2022 ed.) Bench Notes to CALCRIM No. 1515, p. 1084.) Relying on *In re L.T.*, the court suggested the instruction state: "property encompasses personal property . . . , land other than forestland or trash that does not belong to the defendant." The prosecutor agreed. Defense counsel stated he did not have any objection.

The trial court instructed the jury as follows: "The defendant is charged in Counts 1-6 with arson in violation of . . . section 451[, subdivision ](d). To prove that the defendant is guilty of this crime for each count, the People must prove that: [¶] 1. The defendant set fire to or burned or caused the burning of a structure or property; [¶] AND [¶] 2. He acted willfully and maliciously. [¶] To *set fire to or burn* means to damage or destroy with fire either all or part of something, no matter how small the part. [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose. [¶] Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to defraud, annoy, or injure someone else. [¶] *Property* encompasses personal property, land other than forest land, or trash that does not belong to the defendant. [¶] A *structure* is any building." (See CALCRIM No. 1515.)

21

Defendant asserts his right to due process was violated by the trial court's instruction. He asserts the court (1) failed to properly instruct on the elements of arson, (2) added misleading and argumentative pinpoint language, and (3) failed to instruct on the lesser included offense of unlawfully starting a fire.

## B. Instruction on the Elements of Arson

According to defendant, the trial court erred by failing to instruct the jury with optional bracketed language of CALCRIM No. 1515, which states: "A person does not commit arson if the only thing burned is his or her own personal property, unless he or she acts with the intent to defraud, or the fire also injures someone else or someone else's structure, forest land, or property." Defendant asserts the court erred by omitting the requirements from the instructions that the prosecution prove that the property burned did not belong to defendant or, if the prosecution failed to meet that burden, that defendant had the intent to defraud.

Ultimately, we need not delve into the merits of defendant's contention that the trial court erred in omitting the optional bracketed instruction. We conclude any error in doing so was harmless under any standard.

As discussed *ante*, to the extent this case implicates the trial court's failure to instruct on an element, we generally apply the harmless beyond a reasonable doubt standard set forth in *Chapman, supra*, 386 U.S. 18, to determine prejudice in such instances. (See *People v. Sengpadychith, supra*, 26 Cal.4th at pp. 324-325.) "In contrast, 'misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' " in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Before considering each count of arson individually, we must address defendant's argument, relevant to each count, that he took ownership of the trash he burned, thus bringing him outside of the arson statute because he merely burned his own personal property, and a "person does not commit arson if the only thing burned is his or her own personal property" (CALCRIM No. 1515 [optional bracketed language]). We reject this argument.

In *In re L.T., supra*, 103 Cal.App.4th 262, is instructive. There, the minor committed arson by setting fire to cardboard in a trash can at her school. (*Id.* at p. 263.) On appeal, she asserted she did not commit arson because she "merely burned trash, and that trash is not 'property' that belongs to anyone." (*Id.* at p. 264.) Among other things, the Court of Appeal stated: "The trash did not belong to L.T. The trash was in a container on school property. There is no evidence that L.T. did any act causing the trash to become her property before she set fire to it. L.T.'s theory that by burning the trash, it became her property, is meritless. Whether the trash L.T. burned belonged to the school, the city, or the city trash collectors or was abandoned property does not alter the fact that the trash did not belong to L.T." (*Id.* at p. 267.)

We conclude defendant's similar contention here, like the minor's contention in *In re L.T.*, is meritless. Defendant did nothing to convert the trash he lit on fire to his own property. The premise that defendant could remove trash from a trash can, thereby converting it to his own personal property, light it on fire, then place it back into the trash can, and avoid liability for arson because he was merely burning his own property is untenable. Moreover, the objects or property defendant directly lit on fire in turn set additional objects or property in the trash receptacles on fire. If we cannot accept defendant's contention that, by taking an object out of the trash and setting it ablaze, he set fire to his own personal property, by even greater force of reason, we could not accept the premise that the other fuel that was ignited by the fires defendant set also became his property. We proceed to address each count of arson.

23

Counts one and two charged defendant with setting fires in two of the three trash cans at the light-rail station. Investigator Pease observed charred material in one garbage can, and, in another, the entire contents were burned and charred. He saw defendant on surveillance videos approach all three garbage cans at the light-rail station and light fires. Our review of the surveillance video is consistent with this testimony. In People's exhibit 21, before approaching a trash can, defendant left the cardboard box he was carrying on a bench several feet away on the other side of a column. Defendant then approached a trash can, placing his right hand in the trash can for between 10 and 15 seconds, pulling something out of the trash can, placing it back in, placing his arm back in the trash can for several seconds, and then walking away. Minutes later, smoke can be seen coming from the trash can. In another surveillance video, People's exhibit 23, defendant approached another trash can, placed his box on top of the trash can, reached his arm into the trash can for several seconds, and then left. Shortly thereafter, smoke started coming from the trash can. Pease concluded the fires at the light-rail station were lit intentionally. The surveillance video and Pease's testimony establish defendant lit the two charged fires. Moreover, in the case of the first trash can, defendant obtained something from the trash can and returned it to the trash can causing the fire soon thereafter. He did not have his box with him. In the case of the other charged fire, defendant did not put any object into the trash can, but instead reached into it and, shortly thereafter, material in the trash can was burning. In both cases, defendant set fire to objects in the trash cans, causing the fires. There was no evidence that, in connection with these two fires, defendant burned his own property. We conclude, beyond a reasonable doubt, that the lack of an instruction informing the jurors, in part, that a "person does not commit arson if the only thing burned is his or her own personal property" (CALCRIM No. 1515 [optional bracketed language]) did not contribute to the verdict. (See *Chapman, supra*, 386 U.S. at p. 24.) There is not a reasonable possibility

24

that any error in omitting this instruction contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671.)

Count three charged defendant with the Dumpster fire at 2531 Broadway. Investigator Pease described a surveillance video showing defendant walking by, walking west on Broadway. Several minutes later, smoke could be seen coming from the direction of the Dumpster. Pease did not see anyone other than defendant and a bicyclist pass by the area. Pease concluded the fire was caused by someone lighting something on fire and placing it in the Dumpster. People's exhibits 11 and 12 showed the exterior of the Dumpster. Pease described People's exhibit 11 as showing the Dumpster was "charred. It's been burned. It appears to have been burned from the inside. You can see heat damage to the paint on the top and the front. So I determined that there was a fire inside the Dumpster at some point." The jury necessarily determined defendant set this fire. There is no direct evidence to prove whether he ignited something in the Dumpster or ignited his own property to set the Dumpster ablaze. Even assuming he started the fire by burning his own property, however, by doing so, he inescapably set on fire property in the Dumpster that was not his own, as well as the Dumpster itself. We conclude there is not a reasonable possibility that any error in omitting the optional bracketed instruction contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671; see *Chapman, supra*, 386 U.S. at p. 24.)

Count four charged defendant with the Dumpster fire at 1900 S Street. At approximately 3:15 p.m., the dispensary employee saw two Dumpsters engulfed in flames and estimated the flames reached about 20 feet high. Surveillance video, People's exhibits 17 and 18, showed an individual walking in the area just before the dispensary employee encountered the two Dumpsters on fire. People's exhibit 19, with a timestamp of 3:13 p.m., was a still image of that individual. He was wearing a white shirt, baggy pants, and a backpack, and he was holding a cane. This matched clothing worn by defendant at the time. People's exhibit 13, a photograph Investigator Nokes took,

25

showed the scene of the Dumpster fire. The paint on the Dumpster was burned away and the exposed metal was oxidized as a result of the heat. Discoloration on the wall of the building where the Dumpster had been before firefighters moved it indicated the wall had been heated sufficiently to change its chemical composition and color. People's exhibit 14 showed the inside of that Dumpster. Nokes described "charred remains of the contents that were there during the fire . . . ." People's exhibit 15 showed debris on the ground from what appeared to be a nearby melted garbage can. According to Nokes, the garbage can was heated sufficiently for the plastic to melt. It was fairly obvious the fires started inside the containers. The fire was caused by an open flame, such as a lighter or match, applied to the contents of the receptacles. There was no evidence defendant burned his own property, and, even if he did, he unquestionably also set fire to property that did not belong to him. We conclude there is not a reasonable possibility that any error in omitting the optional bracketed instruction contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671; see *Chapman, supra*, 386 U.S. at p. 24.)

Count five charged defendant with the fire at 1725 R Street, the coffee shop. As the coffee shop employee took the trash out, he passed an African-American male walking on R Street towards a light-rail station on 16th Street. He was wearing a white T-shirt and jeans, carrying a cardboard box on his shoulder. In a surveillance video, People's exhibit 20, the coffee shop employee identified the male in the white T-shirt. The individual stopped at a location mostly obscured by an exterior lighting fixture, but a portion of the box the individual carried on his shoulder could still be seen, as the male remained stationary in the area of the trash can. After approximately 70 seconds, the individual walked out of the frame. A few seconds later, smoke began coming out of the trash can. No one else appeared to walk or stop near the trash can. As the employee passed the trash can, he observed "a lot of smoke and flames coming up and out of the front of it." The front and rear of the trash can were open, "so the flames [were] actually coming out of the opening a little bit." There was no evidence defendant burned his own

26

property, and, even if he did, he unquestionably also set fire to property that did not belong to him. We conclude there is not a reasonable possibility that any error in omitting the optional bracketed instruction contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671; see *Chapman, supra*, 386 U.S. at p. 24.)

Finally, count six charged defendant with the Dumpster fire at 1414 Q Street in Quill Alley. Investigator Pease described People's exhibit 24, a surveillance video showing defendant walking from the light-rail station onto Quill Alley and stopping at the location of the Quill Alley Dumpster fire. In that video, Pease described smoke rising from the Dumpster in Quill Alley where defendant stopped. People's exhibit 28 was surveillance video from a garage much closer to the Dumpster. On the video, defendant approached the Dumpster, reached his arm into an opening in the Dumpster, walked away, stopped and observed the Dumpster for a time, and then left. Fire could be seen coming out of the Dumpster less than five minutes after defendant interacted with it. During the preceding time, Pease did not see anyone else interact with the Dumpster. When fire became visible on the video, it appeared the entirety of the interior of the Dumpster was on fire. Pease described "four- to five-foot flame lengths." Pease concluded the fire was caused by an open flame applied to combustible materials, and he found no sources of accidental ignition. It was Pease's opinion defendant started the fire by holding a lighter inside the Dumpster. Defendant set fire to material in the Dumpster, not his own property. We conclude there is not a reasonable possibility that any error in omitting the optional bracketed instruction contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671; see *Chapman, supra*, 386 U.S. at p. 24.)

Because we find any error harmless beyond a reasonable doubt as to all six arson counts under the *Chapman* standard, if instead the *Watson* standard applied, we would necessarily find any error harmless under that less rigorous standard.

27

### C. Additional Pinpoint Language

Defendant also asserts the trial court erred by instructing the jury that "*Property* encompasses personal property, land other than forest land, or trash that does not belong to the defendant." Defendant asserts: (1) this instruction was argumentative, in that it "implied that trash was somehow in a separate legal category" (see *People v. Mullins* (2018) 19 Cal.App.5th 594, 608-609 [discussing argumentative instructions]); (2) by including this instruction and omitting the optional bracketed language, the court emphasized that the material that was burned was property, but omitted the fact that "[a] person does not commit arson if the only thing burned is his or her own personal property" (CALCRIM No. 1515 [optional bracketed language]); (3) this instruction was not an accurate statement of law; and (4) the pinpoint instruction, in concert with the failure to provide the optional bracketed language, reduced the prosecution's burden of proof. Asserting the trial court's error was prejudicial, defendant invokes both the *Chapman* and *Watson* standards. Again, rather than explore the merits of each of these claims, we conclude any error in giving the pinpoint instruction was harmless under any standard.

We have marshalled the evidence concerning each arson count. We need not do so again here. It is not disputed that the material burned by defendant in each of the six fires he started was trash in various trash receptacles. The arson instruction stated the prosecution was required to prove defendant set fire to, burned, or caused to burn a structure or property. (CALCRIM No. 1515.) The pinpoint instruction correctly stated, for purposes of the arson statute, that property included trash *that did not belong to defendant.* (See *In re L.T., supra*, 103 Cal.App.4th at p. 266 [the "arson statute only requires that the property burned not belong to the defendant"].) This is a corollary to the optional bracketed language not given that states, in part, a person does not commit arson "if the only thing burned is his or her own personal property . . . ." (CALCRIM No. 1515 [optional bracketed language].)

28

Whether isolated or in conjunction with the failure to give the optional bracketed language, we conclude, beyond a reasonable doubt, that any error in issuing the pinpoint instruction did not contribute to the verdicts on the arson counts. (See *Chapman, supra*, 386 U.S. at p. 24.)

## D. Lesser Included Offense

Defendant asserts the trial court erred in failing to instruct on the lesser included offense of unlawfully causing a fire/reckless arson.

The obligation to instruct on the general principles of law relevant to the issues raised by the evidence " 'has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' " (*Breverman, supra*, 19 Cal.4th at pp. 154-155.)

The trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman, supra*, 19 Cal.4th at p. 162.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Ibid.*) The court is not required to instruct on theories that are not supported by substantial evidence. (*Ibid.*) " ' "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403.) A trial court's omission in failing to instruct on an

29

allegedly lesser included offense is reviewed de novo. (*People v. Nieves* (2021) 11 Cal.5th 404, 463.)

Reckless arson or unlawfully causing a fire (§ 452) is a lesser included offense of arson (§ 451). (*People v. Atkins* (2001) 25 Cal.4th 76, 88 (*Atkins*) ["The fact that reckless burning is a lesser offense of arson is also not dispositive."]; *People v. Hooper* (1986) 181 Cal.App.3d 1174, 1182 ["unlawfully causing a fire is a lesser included offense of arson"], disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 189, fn. 7.) "A person is guilty of unlawfully causing a fire when he recklessly sets fire to or burns or causes to be burned, any structure, forest land or property." (§ 452.) In the chapter of the Penal Code addressing arson, " '[r]ecklessly' " means, in pertinent part, that "a person is aware of and consciously disregards a substantial and unjustifiable risk that his or her act will set fire to, burn, or cause to burn a structure, forest land, or property. The risk shall be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." (§ 450, subd. (f).)

"The critical distinction between arson, as defined in section 451, and unlawfully causing a fire, as defined in section 452, is the mental state with which the burning is carried out." (*People v. Hooper, supra*, 181 Cal.App.3d at p. 1181.) Arson's "willful and malice requirement ensures that the setting of the fire must be a deliberate and intentional act, as distinguished from an accidental or unintentional ignition or act of setting a fire . . . ." (*Atkins, supra*, 25 Cal.4th at p. 88.) In the context of arson, malice in law "will be presumed or implied from the deliberate and intentional ignition or act of setting a fire without a legal justification, excuse, or claim of right." (*In re V.V.* (2011) 51 Cal.4th 1020, 1028.) "On the other hand, the offense of unlawfully causing a fire covers reckless accidents or unintentional fires, which, by definition, is committed by a person who is 'aware of and consciously disregards a substantial and unjustifiable risk that his or her act will set fire to, burn, or cause to burn a structure, forest land, or

property.' [Citations.] For example, such reckless accidents or unintentional fires may include those caused by a person who recklessly lights a match near highly combustible materials." (*Atkins*, at p. 89.)

Here, the record contains no " ' " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " ' " defendant committed reckless arson (§ 452) but not arson (§ 451). (*People v. Romero, supra*, 44 Cal.4th at p. 403.) There was no evidence suggesting the offense was anything less than arson. In every instance, defendant deliberately and intentionally lit trash inside of a trash receptacle on fire; removed trash from a trash receptacle, set it ablaze, and returned it to the trash receptacle where it was certain to, and did, directly catch other trash on fire; or lit his own property on fire and then placed it in a trash receptacle where it was certain to, and did, directly catch trash on fire. In addition to the witness testimony, our review of the surveillance video evidence supports the premise that defendant deliberately and intentionally set the trash in these trash receptacles on fire. (*Atkins, supra*, 25 Cal.4th at p. 88.) No evidence supported the premise defendant merely disregarded a risk his act would cause the fires; he deliberately and intentionally started fires in six trash receptacles. In the absence of substantial evidence supporting the instruction, the trial court did not err by not instructing the jury on the lesser included offense of unlawfully starting a fire.

### III

### *Custody Credits*

Defendant asserts he is entitled to one additional day of actual custody credit. He asserts he is entitled to 191 days of credit rather than 190 because he is entitled to credit for both the day of his arrest and the day of his sentencing. The Attorney General concedes the point, and we accept the concession with a clarification.

Defendant was entitled to credit for time "in custody, including, but not limited to, any time spent in a jail . . . or similar residential institution . . . ." (§ 2900.5, subd. (a).) "[C]redit for time served commences on the day a defendant is booked into custody,"

31

which is not necessarily the same as the time when a defendant is placed under arrest pending booking. (*People v. Macklem* (2007) 149 Cal.App.4th 674, 702.) A "defendant is not in custody within the meaning of section 2900.5 prior to being processed into a jail or similar custodial situation as described in section 2900.5, subdivision (a)." (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919.)

Defendant was arrested and booked on September 24, 2020, and was sentenced on April 2, 2021. He is entitled to one additional day of custody credit because his time in custody, including the day of his booking and the day of sentencing, was 191 days, not 190. He is not technically correct in claiming entitlement to credit for the day of his arrest, as opposed to the day of his booking. But, because the record establishes defendant was arrested and booked on the same day, this is a distinction that, under the circumstances of this case, makes no difference.

## IV

### *Unauthorized Sentence*

After sentencing defendant on counts six and four, the court stated: "And then I'm going to run the remainder of the terms to be concurrent" under California Rules of Court, rule 4.425. This was error. " 'Upon conviction it is the duty of the court to pass sentence on the defendant and impose the punishment prescribed. [Citations.] Pursuant to this duty the court must either sentence the defendant or grant probation in a lawful manner; it has no other discretion.' " (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468, citing § 12 & *People v. Cheffen* (1969) 2 Cal.App.3d 638, 641-642.) Thus, the trial court was required to impose terms on these counts, whether they were to run concurrently or consecutively. While neither party raises this issue, "it is well established that the appellate court can correct a legal error resulting in an unauthorized sentence . . . at any time." (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13; see *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; *People v. Scott* (1994) 9 Cal.4th 331, 354.) Because the trial court did not impose sentences on counts one, two, three, five, and seven, and

because we cannot say what sentences the court "undoubtedly" would have imposed (*Alford*, at p. 1473), we must remand the matter to the trial court for resentencing. At resentencing, the trial court shall impose terms on all counts and then order counts to run concurrently and/or consecutively as it deems proper and appropriate. At resentencing, all aspects of the sentence may be revisited (see *People v. Buycks* (2018) 5 Cal.5th 857, 893 [a resentencing court may modify every aspect of sentence pursuant to "full resentencing" rule]), although defendant may not be sentenced to a term in excess of his original sentence (see *People v. Burns* (1984) 158 Cal.App.3d 1178, 1184).

## V

### *Senate Bill No. 567 and Assembly Bill No. 124*

While this appeal was pending, the Governor signed Assembly Bill No. 124 and Senate Bill No. 567, both of which make changes affecting trial court sentencing discretion, and both of which became effective January 1, 2022.[7] Defendant asserts that, following enactment of Assembly Bill No. 124 and Senate Bill No. 567, he is entitled to resentencing on the arson counts. He asserts that these enactments apply retroactively to his case. Because we are remanding the matter for full resentencing, we need not address the parties' contentions addressed to these enactments.

---

[7] To be precise, Senate No. Bill 567, the later-enacted bill, incorporated Assembly Bill No. 124's amendments to section 1170 and is the operative legislation. (Stats. 2021, ch. 731, § 3, subd. (c).)

## DISPOSITION

The judgment is modified to award 191 days of actual custody credit for a total of 381 days of presentence credit. The sentence is vacated and the matter is remanded for full resentencing including imposition of sentences on all counts.

                                          /s/
                                          HOCH, J.

We concur:

 /s/
MAURO, Acting P. J.

 /s/
EARL, J.